IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

MID CONTINENT CASUALTY COMPANY,

      Plaintiff/Counter-Defendant,

v.                                    CASE NO. 1:06-cv-00128-MP-GRJ

L. B. KING, d/b/a KING OIL AND TIRES,

      Defendant/Counter-Plaintiff.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Doc. 140, Defendant/Counter-Plaintiff King's Motion for Summary Judgment on Mid Continent Casualty's ("MCC's") Complaint and King's Counter-Claim, and on Doc. 153, Plaintiff/Counter-Defendant MCC's Motion for Summary Judgment. The parties have fully briefed both motions, and they are ripe for adjudication. For the reasons given below, the motions for summary judgment are due to be denied and the case should proceed to bench trial.[1]

## I. BACKGROUND

Since the 1960's, King has owned and operated King's Oil & Tires, a gasoline service station, located at 16776 SE Highway 19 in Cross City, Dixie County, Florida. See L.B. King Depo., Doc. 41, Ex. A at pp. 8-9[2]; Doc. 140 at p. 2. Mr. King bought the

---

[1] Also pending is Doc. 185, MCC's motion to strike some supplemental authority offered by King, and Doc. 186, King's motion for an extension of time to reply to the motion to strike. The extension of time is granted, *nunc pro tunc*, and the motion to strike is denied, although the Court has considered the arguments raised therein.

[2] Neither of the parties electronically filed the full Depositions of L.B. King or the parties' experts, including exhibits, but full versions were filed and kept in the Clerk's office. All excerpts cited herein that contain Document and Exhibit numbers that are

gas station in the 1960s, at which time there were a total of three underground storage tanks (or USTs) on the property.  First, to the east of the dispensing islands, the station had two 10,000 gallon USTs, which each held a certain grade of gasoline (but not any diesel).  These 10,000 USTs had piping leading to the two dispensing islands (called the North and South dispensing islands), which each contained two dispensers, for a total of four dispensers.  (See L. B. King Depo., Doc. 41, Ex. A at pp. 32, 49-50, 55, 60).  Additionally at the NW end of the North dispensing island, another UST was buried, which contained 1,000 gallons of diesel.  The dispenser for this tank was directly above it, at the end of the North dispensing island.  The South dispensing island did not offer diesel.  Id.

In 1978, Mr. King made some upgrades to his property.  First, he removed the two 10,000 gallon USTs and replaced them with three 6,000 gallon USTs.  At the time, the three 6,000 gallon USTs contained only three grades of gasoline; no diesel was in the 6,000 gallon USTs at this time.  Instead the 1,000 gallon diesel UST near the North dispenser island remained in use.  The second upgrade was to add an additional dispenser at each dispensing island, bringing the total to 6.  The third upgrade in 1978 was the installation of a 560 gallon kerosene UST right next to his food mart, and the installation of a 560 gallon UST for waste oil, installed right next to the kerosene UST.  (See L. B. King Depo., Doc. 41, Ex. A at pp. 32, 49-50, 55, 60;  Hirsch 2007 Depo. at p. 46 (available at Doc. 143)).

In 1992, during a FDEP inspection of the station, the inspector noted, "During the

available on CMECF are so noted. The remainder of the cited exhibits can be located only in the hard copy.

time of our inspection, our vapor monitoring device indicated rather high hydrocarbon reading . . . for the well adjacent to the lines running ot the dispenser and those around the gas tanks."  (Plaintiff's Exhibit #7 from 6-7-2007).  No site assessment or remediation was apparently ordered, however, indicating that any leak was likely minor. The station remained in the same configuration until 1997. (See L. B. King Depo., Doc. 41, Ex. A at p. 67).

In 1997, Mr. King engaged in some extensive remodeling.  See  Hirsch 2007 Depo. at pp. 45, 62-64 (available at Doc. 143, pp. 2-21 of PDF); King Depo. p. 67. First, he dug up all the piping and the dispensers and replaced them with new lines and three dispenser islands (evenly spaced West to East) with two dispensers each.  Second, he added a canopy.  Third, he removed the 1,000 diesel UST near the North dispenser island.  Fourth, he switched the northernmost of the 6,000 gallon USTs to diesel and enabled each of his dispensing islands to dispense diesel from that northernmost 6,000 gallon UST.  Id.

The Florida Dept. of Environmental Protection (FDEP) requires a station owner to do some contamination testing and file some reports every time a UST is removed. In 1997, when the 1,000 gallon diesel UST was removed, King hired a contractor Petroleum Aids, who themselves hired a geologist firm, Water & Air Research, Inc. (WAR), to do some testing around the excavation site of the diesel tank. See Hirsch 2007 Depo. at pp. 62-64 (available at Doc. 143).  WAR discovered some diesel contamination that was very low-level, being just above the state guidelines.   Several tests were done in the surrounding area, but no other contamination above state guidelines was found.  Mr. King should have reported the findings to the state of Florida

but never did.  King Depo. at pp. 84-86. He claims he had no knowledge of it at the time, and thought it was the scientist's or the contractor's job to file the report for him. He eventually reported it in 2003. Id.

The station stayed in this configuration until late 2003 or early 2004.  In the meantime, however, throughout 2000-03, the FDEP issued a series of citations and fines regarding all kinds of failure on Mr. King's part to implement anti-contamination measures.  The citations, examples of which are Plaintiff's Exhibits #8 through #15 to Mr. King's Deposition on 6-7-2007, include everything from a lack of dispenser liners and overfill protection (Exhibits # 8 and #9) to a failure to conduct and record various inspections and tests (Exhibit #11) to failure to provide release detection methods, tightness test results, containment systems, and interstitial monitoring (Exhibit #12), for example.

One regulation that Mr. King did comply with, however, was the state and federal requirement that station owners demonstrate financial responsibility for clean-ups by buying insurance.  The regulations provide that:

> Owners or operators of petroleum underground storage tanks must demonstrate financial responsibility for taking corrective action and compensating third parties for bodily injury and property damages caused by accidental releases arising from the operation of petroleum underground storage tanks . . . .

40 C.F.R. 280.90, Subpart H; 280.93(a).

> The owner or operator of a facility, or individual tanks, if of different ownership, shall demonstrate financial responsibility . . . [t]he demonstration shall be made by the owner or operator in accordance with C.F.R. Title 40, Part 280, Subpart H.

F.A.C. Rule 62-761.400(3)(a)(1)-(2).

In April of 2003, King applied for an insurance policy from MCC. In his application -- despite the three year history of tussles with the FDEP involving citations and fines, and his knowledge of the spill in 1997 -- he checked "No" when asked if there had ever been any pollution related incidents at the property, and "No" to whether there had ever been any fines, penalties or legal actions including state, federal or any other compliance order on any pollution incident.  He also answered "Yes" when asked on the application if all his tanks were in compliance with state and federal regulations. (Application found at Plaintiff's Exhibit #16 to King's Depo. of 6-7-2007).

MCC issued a policy to King with a coverage period from April 3, 2003 to April 3, 2004, and a retroactive date of April 3, 1998.  (See MCC Complaint at ¶1; King's Request for Admissions at ¶8; MCC's Answer to King's Request for Admissions at ¶8). The policy's retroactive date indicated that claims for releases occurring before April 3, 1998 would not be covered; claims for releases occurring after April 3, 1998 and until April 3, 2004 would be covered, so long as they qualified under all other terms of the policy.  (See Exhibit A to MCC's Complaint).  Whether King can prove the release happened in this time period is a key issue in the case.

Later, in August and September of 2003, King finally got around to reporting the 1997 discharge to the State of Florida.  King Depo. pp. 80-81.  Also, he filed a claim with MCC, even though the discovery was in 1997, meaning the spill had to have happened before the retroactive date of the policy.  King Depo. at p. 182.  His claim was denied by MCC, and King has given up on any claim involving the 1997 contamination near the 1,000 gallon diesel tank.  Id.  The station remained unchanged

until 2004.

In late 2003 or early 2004 – the record is not clear on this point – King had the kerosene and waste oil tanks removed. (compare King Depo. at p. 56 with King Depo p. 88). Pursuant to state guidelines, he again had to hire WAR to test around the excavation site for a tank closure report. King Depo. at pp. 90-91. The report found kerosene contamination at the site of the kerosene tank excavation and also gasoline contamination between the kerosene excavation and the three 6,000 gallon USTs. King's Exhibit 7 to King's Motion for Summary Judgment, found at Doc. 143, p. 23 of the PDF. The report contained the opinion that the gasoline contamination likely came from the 6,000 g underground storage tanks themselves, rather than any piping or from the kerosene or waste tank. Id. On April 1, 2004, King made a claim with MCC for this contamination. King's Trial Exhibits # 3 and #4.

When the FDEP got the report this testing generated, in March or April of 2004, it required a full site assessment. Joint Trial Exhibit #20. The full site assessment, also conducted by WAR, revealed extensive gasoline and diesel pollution in the western part of the property ("western contamination"). Eventually, in March of 2005, WAR created several isoplethic maps showing the rough contours of the contamination. (Isopleths are like contour lines on a terrain map, but instead of showing lines of the same elevation, they show lines of the same concentration of a pollutant.) The plume is centered directly over the underground piping running from the 6,000 g USTs to the three dispenser islands. However, the point containing the highest concentration of pollutants is found over the then-former location of the removed-in-1997 South dispenser island. Hirsch 2010 Depo. p. 21-24; Supplemental Site Assessment Report,

Joint Exhibit #29, Figures 5-9.

Meanwhile, as the site testing and retesting was being done in 2004 and 2005, King replaced the three 6,000 gallon tanks with a single compartmentalized 20,000 gallon tank.  This was completed in November of 2004, and is the way the station is configured today.

**The Expert Opinions**

Based on the fact that the highest concentration was over the former location of the South dispenser island, MCC's two experts (Greg Self and Paul Muthig) opine that the former South dispenser island was the source of the contamination.  Muthig Depo. pp. 22-23; Self Depo. 46-48.  Mr. Muthig also points to the 1992 inspection report showing elevated vapor readings as evidence of a leak at the South dispenser island prior to 1997.  Muthig Depo. 24-25.  Because the South dispenser island was removed in 1997, before the retroactive date of the policy, if the contamination was from that island, no coverage would exist under the policy.  It should be noted that neither of MCC's experts conducted their own site assessment or soil/groundwater analysis; they simply reviewed the data and reports generated by King's experts, WAR and James Hirsch.

King's expert from WAR, James Hirsch, concludes that the contamination must be from the lines running west from the three 6,000 g USTs and into the three dispenser islands and must have happened close to 2004.  First, Hirsch's report, entitled Evaluation of Petroleum Contamination Sources at the King B.P. Site (available at Doc. 148, pp. 2-6 of the PDF), eliminated the two 10,000 Gallon USTs removed in 1968 as possible sources of contamination, stating,

> soil and groundwater testing conducted at their former location in 2004
> and 2005 during closure of three 6,000 gallon USTs removed to make
> space for the installation of the active 20,000 gallon UST, showed no soil
> contamination within tank excavation area containing the three active
> USTs."

Id. p. 2 of the PDF.

Next, Mr. Hirsch rejected the 1992 spill as the source of the western contamination because (1) it was so small it did not trigger remediation instructions from FDEP and thus could not have caused the large contamination plume, (2) the leaking pipe was described as being above-ground, and the area was covered by asphalt which would prevent the spill from entering the soil, and (3) testing in 2004 found no gasoline-type analytes around the 1992 site, but did discover diesel contaminants.  The dispensers in this area only dispensed gasoline, not diesel.  Id. p. 1-2.

Hirsch then eliminates the 1997 spill near the 1,000 gallon diesel tank as a cause because the amounts of diesel contaminants found in 2004 are much higher than those found in 1997.  A tank cannot keep leaking into the ground if it is no longer there, he opined, so the amounts should be less not more.  Also, there is gasoline present in the current plume, and the 1997 contamination only involved diesel.  Id. at 2-3.

He then offers several reasons for discounting the South dispenser island, which was removed in 1997.  First, the south dispenser island never dispensed diesel and the current plume contained significant amounts of diesel.  Second, the current plume overlaps the areas in which no contamination was found in 1997.  If the South Island was a source, contamination would have been found at that time in that place, but it was not.  Third, in 2009, the size of the plume was recalculated, and it was found to

have shrunk "significantly."  Extrapolating backwards using the rate of shrinkage, Hirsch concluded that the contamination could not have occurred much earlier than late 2003. The shrinkage of the plum also helps Hirsch to reject the newly installed pipes (installed with the 20,000 tank) which are currently in the ground at King's BP.  If there still was a leak, the plume would continue to grow, not shrink.  Id. at 3-4.

Hirsch next opined that the kerosene and waste oil tanks could not be the source of the western contamination because (1) the contamination found in the kerosene excavation site did not include gasoline-type analytes, unlike the western contamination; and (2) no petroleum vapors were found at SB-8, which lies between the kerosene and waste tanks and the western contamination.  The contamination would have had to leap over this area to go from these USTs to the site of the western contamination.  Id. at 4.

The three 6,000 gallon USTs were a source of minor contamination on the east side of the property, but from there west, no evidence of contamination was found in the excavation site of these three tanks in 2004.  Thus, they could not be the source of the western contamination.  Id. at 5-4.

Finally, two other sources of contamination were easily discounted by Hirsch. First, off-site contamination was not a possibility, opined Hirsch, because none of the surrounding businesses were active sources of petroleum contamination.  Second, there were no records, accounts, or evidence of the type of "catastrophic" surface release that would be needed to generate a contamination plume like the one discovered in this case, he opined, and also the property was covered in asphalt and concrete, so surface releases would not be expected to impact soil or groundwater.  Id. at 5.

**The Insurance Policy**

The suit in this case arises out of Coverage B of the policy, which covers clean-up costs rather than liability to others.  In Coverage B, MCC agrees that

> We will pay clean-up costs incurred by an Insured for **environmental damage** that an **Insured** is legally obligated to pay from scheduled **Storage Tank System(s)** as a result of a **Confirmed Release(s)** provided the **Confirmed Release(s)** commences after the **Retroactive Date**.

(Section I.  Insuring Agreement).

The definition of the words "release" and "confirmed release" are at the heart of the claims in this case.  According to the policy, the term "release" means

> any spilling, leaking, emitting, discharging, escaping or leeching of one or more Regulated Substances from a Storage Tank System into groundwater, surfacewater, surface or subsurface soils, or the atmosphere.

(Section III.O. Definitions).

Also, the term "confirmed release" means

> a Release that has been investigated and confirmed by or on behalf of an Insured utilizing a system tightness check, site check or other procedure approved by the Implementing Agency in accordance with 40 C.F.R. 280.52 or another applicable federal or state regulation or state statute.

(Section III.E. Definitions)

MCC essentially argues that King cannot show that he confirmed a release from the storage tanks after the retroactive date.  MCC also argues that two exclusions to the policy bar coverage.  The first is exclusion A, which excludes any claim

> Arising from a Release existing prior to the inception of this Policy, if any employee of an Insured responsible for environmental affairs, control or compliance or any manager, supervisor, officer, director, or partner of an Insured knew or could have reasonably foreseen that such Release could have been expected to give rise to a Claim.

(Section IV.A. Exclusions).

The second exclusion pointed to by MCC is exclusion G, which excludes any

claim under Coverage B in the following situations:

> 1. for any Clean-up Costs arising out of the reconstruction, repair, replacement, upgrading or rebuilding of any Storage Tank System or any other improvements and any site enhancement or routine maintenance on, within, or under the locations designated in the Declarations.
>
> 2. For any costs arising out of the removing, replacing or recycling of the contents or any Storage Tank System

## II.  PROCEDURAL HISTORY

On April 1, 2004, King filed a claim seeking coverage for clean-up costs.  (See

Doc. 140 at ¶7).   The following day, Mid-Continent sent King a Reservation of Rights

letter asserting certain policy exclusions.   (See Mid-Continent's Statement of Material

Facts In Opposition to Plaintiff's Statement of Material Facts, at ¶6; King's Statement of

Material Facts, at ¶6).  On December 15, 2005, Mid-Continent denied coverage

altogether on the grounds that the contamination was not a "Confirmed Release," or a

spill from the storage tank system, as defined under the policy.  (See Mid-Continent's

Statement of Material Facts In Opposition to Plaintiff's Statement of Material Facts,

Doc. 41 at ¶9; King's Statement of Material Facts, at ¶9).

Mid-Continent initiated the present case on June 26, 2006, and brought a claim

for declaratory relief seeking the following declarations:

(1) that the policy is void  *ab initio* pursuant to section 626.409, Florida Statutes

(2007), due to material misrepresentations by King (Complaint, ¶ 25);

(2) that the policy does not cover the release reported April 1, 2004, because

there has been no report or evidence of a "confirmed release" as that term is defined by

the policy (Complaint, ¶ 26); and

(3) that the policy does not cover the release reported April 1, 2004, because it pre-dated the inception and/or the Retroactive Date of this Policy, and King neither disclosed the alleged release in his application, nor maintained similar liability insurance policies for the periods succeeding the alleged release (Complaint, ¶ 27).

King filed an Answer with affirmative defenses and a Counterclaim (Doc. 5).  In the first affirmative defense, King simply notes that the release for which he seeks coverage was discovered in March of 2004 and therefore after the retroactive date, April 3, 1998, and before the termination date, April 3, 2004.  In the second affirmative defense, King claims that Mid-Continent sent a reservation of rights letter on April 2, 2004 which only relied upon Exclusion G of the policy.  By doing so, King claims that Mid-Continent waived any other bases for not covering the claim, including misrepresentation.  In the third affirmative defense, King notes that he informed Mid-Continent about the 1997 discharge finding in September of 2003.   King argues that at that point, when Mid-Continent simply denied coverage of the 1997 discharge – rather than canceling the policy *ab initio* – Mid-Continent induced King to rely on the continued existence of coverage and thus Mid-Continent should be held to have waived any misrepresentation argument.  Finally, in the fourth affirmative defense, King claims that the failure to disclose the 1997 discharge was not material, in that Mid-Continent would have issued the policy anyway, and for the same premium.

King's Counterclaim contains two counts, and is essentially the opposite of the Complaint.  The first count seeks a judgment declaring that Mid-Continent has a duty to pay "clean-up costs" for the discharge reported April 1, 2004, and imposing payment of

reasonable attorney fees under Fla. Stat. §§ 86.081 and 627.428.  In the second count, King alleges that Mid-Continent breached the contract of insurance by failing to provide coverage for the "clean-up costs" associated with the discharge reported April 1, 2004. He also seeks reasonable attorney fees under the statutes listed above.  Mid-Continent then filed (at Doc. 7) an Answer to the Counterclaim, including twenty-four affirmative defenses.

### The First Round of Summary Judgment Motions

The parties then conducted some discovery, and eventually both sides filed motions for summary judgment.  The first was King's motion for partial summary judgment. (Doc. 38).  In the motion for partial summary judgment, King argued that it is entitled to partial summary judgment on the following issues:  (1) Mid-Continent's claim that the subject policy is void *ab initio* because, King argues, federal law and the United States Environmental Protection Agency regulations, 42 U.S.C. § 6991b and 40 C.F.R. § 280, preclude rescission of King's policy *ab initio;* (2) Mid-Continent's claimed right to rescind the policy because Mid-Continent waived any such right to rescind; (3) Mid-Continent's claimed coverage defenses under any Exclusion in the Policy, because any such defenses have been waived by Mid-Continent pursuant to Fla. Stat. § 627.426(2); and (4) Mid-Continent's affirmative defenses to King's Counterclaim because Mid-Continent failed to present any evidence in support of any of its affirmative defenses.

Mid-Continent filed its own motion for summary judgment (Doc. 40), seeking a declaration that no coverage exists under the subject Policy.  In this motion, Mid-Continent raised two arguments: (1) that King has failed to carry his burden of establishing that the reported discharge originated from the tanks or related equipment;

and (2) that King has failed to carry his burden of establishing that the reported

discharge occurred during the covered period of the insurance policy.

On March 11, 2008, this Court denied Mid-Continent's motion for summary

judgment and granted in part and denied in part King's motion for partial summary

judgment.  (Doc. 64).  The Court began with King's motion.  With regard to King's first

argument, the Court stated,

> The undersigned agrees ... with the Whittier Court and the EPA's own
> interpretation of 40 C.F.R. § 280.97(b) that "the exclusive remedy for a
> UST policy provider, in the event of an insured's misrepresentation, be a
> *future* refusal to provide insurance. This interpretation precludes the
> remedy of rescission." Whitter, 356 F.3d at 1136-37 (explaining the
> position of the EPA taken in an *amicus curiae* brief in Whittier)(emphasis
> on word "future" in original).

Because the above conclusion prevented rescission of the policy *ab initio*, the Court

found that King's second argument, that MCC waived its right to rescind, was moot.

The Court then considered King's argument that Mid-Continent waived various

affirmative defenses because any such defenses should have been referenced in the

reservation of rights letter pursuant to Fla. Stat. § 627.426(2) but were not.  The Court

noted the difference between scope of coverage arguments – in which the insurer

argues that the claim is not covered by the policy or is excluded by the policy – and

coverage defenses – in which the insurer argues that even if the loss falls within the

policy and is not excluded, the claim still should not be paid because of other factors,

such as a failure of insured to give proper notice of the claim.  Scope of coverage

arguments are not waived by failure to include them in the reservation of rights letter,

whereas coverage defenses are.  As a result, the Court concluded that Mid-Continent

had waived affirmative defenses 3, 11, 12, 15, 20, and 21 but had not waived the

others.  Also, the Court found that those remaining affirmative defenses survived summary judgment at that stage in the case.

The Court then turned to MCC's motion.  Here MCC raises an argument it continues to advance.  MCC argues that the expert witness of King, "has failed to provide evidence that any of this contamination originated, or leaked, from any of the tank systems, whether from the tanks themselves, pipes, dispenser pumps, or related tank equipment, and thus has failed to establish that a 'release' or 'confirmed release' has occurred." Doc. 40, p. 3. Instead, MCC insists that the expert is merely speculating as to where and when the discharge occurred. The Court disagreed, and stated the following:

> although the expert stated he could not – at that time – pinpoint the location of the point of discharge, he has provided sufficient reliable scientific information for the finder of fact to conclude that a confirmed release had occurred. For example, Mr. Hirsch, who has 17 years experience as a professional geologist, averred in his affidavit that he was able to isolate the contamination discovered in 2004 from the discharge discovered in 1997 using groundwater quality tests involving Volatile Organic Aromatics and Polynuclear Aromatic Hydrocarbon levels. Also he was able to aver, "There is no evidence of an off-site source or an on-site surface spill that could have resulted in the contamination." Affidavit of James Hirsch, Attachment to doc. 54. This evidence is sufficient to create a genuine issue of material fact regarding the source of the release and the time period. The fact that Mr. Hirsch was unable to "pinpoint" the location and timing of the discharges can be used to impeach the testimony, but is not sufficient to require summary judgment.

Following the Court's order, the parties conducted additional discovery, including taking the deposition of each other's experts and the completion of additional site assessment activities and the publication of additional materials by King's expert, Dr. Hirsch.  The Court also issued a pre-trial order, setting a pre-trial conference for May 15, 2008.  Pursuant to the order, the parties filed various pre-trial materials, including a

pre-trial stipulation, in which they agreed to a non-jury trial.

Eventually, however, after a failed interlocutory appeal and several extensions of time, the pre-trial conference was held on July 7, 2008.  At the conference, the parties requested that the trial be delayed to allow the parties to continue mediating the case. The Court in the order at Doc. 95 reset the pre-trial conference for October 15, 2008. In September of 2008, the parties reported that their mediation had reached an impasse.  On the eve of the October 15, 2008, pre-trial conference, however, the parties stipulated to a stay until February of 2009, with a new pre-trial conference date set at that time, if necessary.  Doc. 103.

Thus began a series of stays requested by the parties, so that a full site assessment could be completed, submitted to FDEP and analyzed by the parties:  In Doc. 106, in response to a request from the parties, the Court granted a further stay.  In Doc. 108, in response to a request from the parties, the Court stayed the case until June 23, 2009, to allow WAR to complete Site Assessment Addendum #4.  In Doc. 111, the case was stayed until September 9, 2009; in Doc. 114, until September 30, 2009; in Doc. 116, until October 28, 2009; in Doc. 119, until February 2, 2010; and in Doc. 121, until April 8, 2010.

Finally, in Doc. 122, MCC moved to lift the stay to allow the resolution of the lawsuit, but indicated that continuing discovery was necessary.  The parties thus requested that the case be set for trial in September of 2010.  The Court responded with the pre-trial orders at Docs. 123 and 124, lifting the stay and setting the matter for pre-trial conference in August of 2010.  In June of 2010, however, MCC moved for an extension of time to complete discovery, Doc. 129, and latter the parties jointly moved

to re-open the time for filing additional dispositive motions. Doc. 133, a telephone conference was held on August 20, 2010, and then a new pre-trial order was entered August 20, 2010, setting the pre-trial conference for October 13, 2010.  Doc. 138.  After an extension of time, Doc. 163, the parties finished their motions for summary judgment and responses and the motions are ripe for disposition.

### III.  PENDING MOTIONS

### Doc. 140, King's Motion for Summary Judgment

Mr. King's motion for summary judgment begins by addressing the central issue in the case -- whether King has shown coverage under the policy.  After setting out the opinion of his expert, which is described above, King makes the following argument:

> 72.  Based on the foregoing, King has established that there was a Confirmed Release subsequent to the Retroactive Date. Contrary to MCC's argument, the Policy does not require that the insured "pinpoint" the exact cause and timing of a Release. The Policy only requires that the insured demonstrate via a "site check" that the Release came from a covered Storage Tank System and commenced subsequent to the Retroactive Date. Here, King has met this burden.

> 73.  This is not a case where we have mere disagreement amongst the experts. MCC's expert's opinion that the western contamination came from the former north and south dispenser liners is factually indefensible. It is undisputed based on the contaminant levels that the Release occurred close to 2004. This would be several years after the north and south dispensers were removed. Furthermore, the western contamination includes diesel contamination. The north and south dispensers cannot be the source of diesel contamination because diesel was never dispensed from these dispensers. Diesel was only dispensed at the former 1,000-gallon diesel tank (which in 1997 when it was removed had only relatively minor contamination) and from the active westernmost dispenser that currently dispenses diesel (and has been identified as a potential source of contamination by Mr. Hirsch) and would be part of the covered Storage Tank System.

Doc. 140., p. 31.

In its response, Doc. 160, MCC begins with the dubious statement that "The Motion [by King] ignores King's own admissions, through its retained contamination expert, concerning the sources of contamination as most likely emanating from a nearby source area, the former south dispenser island, which was removed from the property in 1997." Doc. 160, p. 2.  That statement does not have a citation as to where such an admission is supposed to have occurred.  The Court has read every line of Hirsch's two depositions and his reports, and he very clearly opines that the buried fuel lines active at the time the contamination was discovered in 2004 were the likely sources of the contamination, not the south dispenser island.

MCC then contends that the release was never "confirmed" because a "site check was not properly performed under the very definitions cited by King." Id.  Under the policy a confirmed release is "a Release that has been investigated and confirmed ... utilizing a system tightness check, site check or other procedure approved by the Implementing Agency in accordance with 40 C.F.R. § 280.52 or another applicable federal or state regulation or state statute."

MCC points to the following language in § 280.52(b) for the definition of a site check:

> (b) *Site check.* Owners and operators must measure for the presence of a release where contamination is most likely to be present at the UST site. In selecting sample types, sample locations, and measurement methods, owners and operators must consider the nature of the stored substance, the type of initial alarm or cause for suspicion, the type of backfill, the depth of ground water, and other factors appropriate for identifying the presence and source of the release.

MCC then argues that even though King's expert conducted numerous borings and well placements all across the property, King did not conduct a "site check"

because he did not send the soil sample at KB-3, which showed high contamination in

vapor tests, to the laboratory.

First of all, the regulation simply requires that the expert "measure for the

presence of a release" in the most likely areas.  It does not specify that once the expert

finds the presence, through vapor tests, the expert then has send it to the laboratory for

further tests.

Second, MCC's focus on this language misses the point of the regulation.  The

beginning of § 280.52, which MCC fails to include, reveals the real point of these

regulations:

> **§ 280.52 Release investigation and confirmation steps.** Unless
> corrective action is initiated in accordance with subpart F, owners and
> operators must immediately investigate and confirm all suspected
> releases of regulated substances requiring reporting under § 280.50
> within 7 days, or another reasonable time period specified by the
> implementing agency...

In other words, these regulations are concerned with an owner who has reason to

suspect a release but may be reluctant to prove that there is one.  Under the

regulations, the reluctant owner must investigate and confirm all "suspected" releases,

unless corrective action has already been initiated.   The owner is naturally required to

check for the release in the place where it is most likely to be, to prevent the owner from

checking somewhere else on the site to avoid finding the release.  Thus, the regulations

are not truly concerned with an owner who already has confirmed the release by

various means, like those employed by King's expert.  Indeed, the "corrective action"

from Subpart F, discussed at the beginning of § 280.52, includes the type of activities

King was participating in at the time of the claim to MCC, revealing that the EPA does

not want an owner to continue testing after he has confirmed that contamination is in the ground; instead, remediation should begin immediately.  Simply put, the extensive testing and assessment undertaken by WAR in this case more than satisfies the term "site check" as used in the policy and in the regulations.

King has, thus, offered evidence raising a genuine issue of material fact and supporting his position that the contamination is covered by the policy.  However, the testimony of MCC's experts that the contamination likely came from the South Dispenser Island also provides evidence supporting its position.  Thus, summary judgment on this central issue is not appropriate at this time because there are genuine disputed issues of material fact.

The next argument in King's motion for summary judgment involves MCC's affirmative defenses 2, 4, 5, 6, 7, 8, 9, 10, 13, 14, 18, 19, 22, 23, and 24, which are the only ones remaining after the Court's previous summary judgment order.  Affirmative Defenses 2, 13, 14 and 18 all claim that King has not proved that a confirmed release occurred or simply argue that he does not state a cause of action.  These arguments are dealt with by King's arguments above concerning the evidence of where and when the contamination originated.   For the same reasons given above, summary judgment is not appropriate on these issues.

Likewise, affirmative Defenses 4, 5, 6, 7, 19, 23, and 24 all involve whether the release pre-dated the retroactive date of the policy and therefore triggers Exclusion A. King points out that he is not seeking reimbursement for the 1997 contamination discovered near the old 1,000 diesel UST; instead, these affirmative defenses are based on MCC's experts' conclusion that the western contamination originated from the

South Dispenser Island, which was removed in 1997.  King argues that his expert has shown that the contamination must have come from the lines active in 2004, at a time close to 2004, and not earlier from the former dispenser islands.  Thus, affirmative defenses 4, 5, 6, 7, 19, 23, and 24 are dependent upon the disputed material fact of when and where the contamination arose and summary judgment is, therefore, inappropriate.

With regard to affirmative defense #10, alleging unclean hands on the part of Mr. King, King argues that MCC has not offered any evidence of unclean hands other than misrepresentation when filling out the policy application.  The only remedy for that, he argues, is future refusal to provide insurance, not preventing payment of prior claims.  Thus, summary judgment should be granted for King on this affirmative defense.

Affirmative defense # 22 claims that King was merely a volunteer when he incurred costs to clean up his station and did not get MCC consent to incur clean up costs.  King argues that he was required by Florida regulators to conduct assessment or clean up activities.  Thus, there is no dispute that he was not a volunteer and, therefore, summary judgment should be granted for King on this affirmative defense.

With regard to affirmative defenses #8 and #9, alleging failure to mitigate damages and the doctrine of laches, the Court agrees with King that MCC has not offered any evidence to support these defenses.  He points to the deposition testimony of Mr. Elwood, corporate representative of MCC who was unable to point to any evidence to support either affirmative defense.  Accordingly, summary judgment in favor of King should be granted on this affirmative defense.

## Doc. 153: MCC's Motion for Summary Judgment

MCC begins with the disingenuous argument that "King cannot provide any testimony regarding the source or date of the release."  Doc. 153, p. 4.  As discussed above, while it is true that Hirsch cannot specify exactly from which pipe, dispenser or fuel line active in 2004 the release originated, he does opine, and give good reasons for his opinion, that the contamination occurred in late 2004 from the then-active fuel lines and dispensers.  He also eliminates all other potential sources.

What MCC is really doing is attempting to resurrect the 'pinpointing' argument previously rejected by this Court.  To support its 'pinpointing' argument, Mid-Continent cites to one case, ABO Petroleum, Inc. v. Colony Ins. Co., 2005 WL 1050220 (E.D. Mich. 2005), and makes two dubious statements about it.  First, MCC states, "This requirement, that the insured locate the precise source of the leak, is supported by the Country's leading case concerning a 'Confirmed Release'" (referring to ABO).  However, the statement that ABO is some kind of "leading case" is disingenuous at best.  The case is not reported in Fed. Supp. and a "Citing References" report on Westlaw reveals that only one Court has ever cited or discussed ABO, Lower Town Project, LLC v. Lawyers Title Ins. Co., Slip Copy, 2011 WL 3319710 (E.D.Mich.,2011), and it did not even discuss the issue of a confirmed release.

The second dubious statement about ABO is MCC's argument that "The insured [in ABO], like the insured in this case, failed to provide the carrier with the exact source or timing of the release."  Doc. 160, p. 4.   However, in ABO, the insured provided no evidence of the cause of the spill whatsoever, other than a single test done only days before the claim was filed.  The ABO Court summarized the state of the record as

follows:

> [T]he general manager for ABO ... was examined under oath. He testified that when Plaintiff acquired the gas station in 1997 no environmental testing was done. ( Id. at Ex. N.) Nor was any testing conducted from 1997 through 2003. Id. [the general manager] stated that no environmental consultant had advised him of the specific source of the release and that the consultants had not concluded that the contamination emanated from the vehicle collision with a pump in March 2003. ( Id.) He also stated that there was no indication of a loss in inventory in March 2003 and that a loss of 150 gallons would be significant. ( Id.) Another tank tightness test was performed in January 2004. This test did not identify any leaks in the system. ( Id. at Ex. O.).

ABO, 2005 WL 1050220, at *5.

In contrast, in the instant case, King has presented the opinions of Mr. Hirsch of WAR and the results of both the 2004 Tank Closure Assessment Report (Doc. 151, Ex. 7, pp. 25-27 of the PDF) and the subsequent Site Assessment Report and Addenda (Doc. 145, Exs. 13-14) to show that the Release at King Oil and Tire emanated from the covered UST system.  Additionally, King, unlike the insured in ABO, also has provided factual support that, if believed, rules out the possibility of non-covered sources of the Release.   As noted above, the 2010 report of James Hirsch, summarizes the extent of the evidence excluding all other possible sources of contamination.  Finally, King has presented support for its argument that the Release at issue commenced in or around 2004. (Doc. 150, Ex. 29).  As a result, King has presented, at a minimum, sufficient evidentiary support for a reasonable fact-finder to conclude that the release at issue did emanate from the covered UST system.  Thus, ABO is easily distinguished from the instant case.

MCC's next argument fares even worse.   As noted above, Exclusion G excludes "any Clean-up Costs arising out of the reconstruction, repair, replacement, upgrading or

rebuilding of any Storage Tank System" or "any costs arising out of the removing, replacing or recycling of the contents or any Storage Tank System."  Because the western contamination was discovered during the testing required as a result of the removal of the kerosene and waste oil tanks, MCC concludes that the costs are "arising out of" the removal of the kerosene and waste oil tanks and are thus excluded. However, the phrase "arising out of" requires that the contamination -- and not just its discovery -- be proximately caused by the removal activity.  Here, as discussed above, Mr. Hirsch has offered evidence that nothing about the kerosene and waste oil tanks caused the western contamination and thus the contamination did not arise out of their removal.

MCC's third argument is another instance of attempted resurrection.  In its first order on summary judgment, the Court agreed with the Ninth Circuit in Whittier and the EPA's own interpretation of 40 C.F.R. § 280.97(b) and held that the exclusive remedy for a UST policy provider, in the event of an insured's misrepresentation on his application, is a *future* refusal to provide insurance, and not rescission of the policy *ab initio*.  Doc. 64.  Nevertheless, MCC argues that misrepresentation might trigger Exclusion A.  As noted above, Exclusion A excludes claims

> [a]rising from a Release existing prior to the inception of this Policy, if any employee of an Insured responsible for environmental affairs, control or compliance or any manager, supervisor, officer, director, or partner of an Insured knew or could have reasonably foreseen that such Release could have been expected to give rise to a Claim.

Like Exclusion G, this exclusion requires that the current claim arise from something - in this case the prior undisclosed release.  MCC bases this claim on the low-level, small-area 1997 contamination near the 1,000 gallon diesel tank, stating,

> Specifically, King does not dispute that it hired Petroleum Aids, Inc. to
> remove its Underground Storage Tanks in 1997. [Doc.39]. It also does not
> dispute that WAR, acting on behalf of Petroleum Aids, Inc., prepared a
> Tank Closure Assessment Report in September 1997, reporting the
> presence of petroleum contamination resulting from past operations.

(Doc. 153, p. 18-19).  While it is true that King did not reveal this contamination when he filled out his application, MCC's own experts testify that the western contamination arose from the South Dispenser Island.  On the other hand, King's expert opined that the 1997 contamination near the 1,000 gallon tank could not have caused the western contamination because it was lower in 1997 than in 2004, even though the diesel tank was removed in 1997, and also because the 1997 contamination was only diesel while the western contamination is both diesel and gasoline.  Thus, summary judgment is not appropriate on the basis of Exclusion A because the evidence is at best disputed that the current western contamination arose from contamination discovered in 1997.

MCC concludes with the argument that "King has asserted that it is not seeking coverage for any previous spills, and is only seeking coverage for the 2004 spill."  As support for this argument MCC cites to King's Counterclaim, at Counts I and II [D.E.5]; Exhibit D, at No.4.  Thus, according to MCC, King should only recover for the small kerosene contamination which was limited to the kerosene extraction site and the small gasoline contamination which was limited to the former site of the 6,000 USTs themselves (on the east side of the property).  The problem with this argument is that King includes the western contamination, discovered in 2004, in his conception of the term "2004 spill."  Thus, when King states that he is not seeking reimbursement for spills earlier than the 2004 spill, it is evident that he means he is not making a claim arising out of the contamination discovered in 1997 near the 1,000 gallon diesel tank.

As such, there is no merit to this fourth claim by MCC and accordingly summary judgment is not appropriate on this claim.

## Conclusion

In view of the testimony of King's expert, based upon extensive site assessment evidence, there are genuine disputes as to material facts and therefore MCC's motion for summary judgment should be denied.   Likewise, in view of the testimony of MCC's expert, King's motion for summary judgment should be denied in part, and granted in part as discussed above.

## IV.  ORDER AND RECOMMENDATION

 Accordingly, upon due consideration, it is **ORDERED** that:

1.  MCC's motion to strike, Doc. 185, is **DENIED**, and;

2.  King's motion for an extension of time to reply to the motion to strike, Doc. 186, is **GRANTED**.

Additionally, for the foregoing reasons, it is respectfully **RECOMMENDED** that:

1.  The motion for summary judgment at Doc. 153 should be **DENIED**, and the motion for summary judgment at Doc. 140 should be **GRANTED in part and DENIED in part**.

2.  As the parties have filed their pretrial materials and have agreed to a bench trial, the Clerk should be directed to set this matter for a pre-trial conference.

3.  In accordance with Rule 73.1(A) of the Local Rules, the parties should be directed to confer regarding their willingness to consent to the undersigned magistrate judge.  If all parties, after conferring with one another, elect to consent to magistrate judge jurisdiction, a form of consent should be signed by all parties and filed in the

clerk's office. It shall be plaintiff's responsibility to forward the form to defendant(s), who, in turn, shall have the responsibility of filing the document. The form should be filed only if all parties have consented and signed the form.

**IN CHAMBERS** in Gainesville, Florida this 12th day of January, 2012.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**